[No. 66514-6-I.   Division One.   July 2, 2012.]

GARY C. ROATS, *as Trustee and as Owner*, ET AL., *Appellants*, v. BLAKELY ISLAND MAINTENANCE COMMISSION, INC., ET AL., *Respondents*.

264

*Arthur W. Harrigan Jr.*, *Christopher T. Wion*, and *Elizabeth W. Perka* (of *Danielson Harrigan Leyh & Tollefson LLP*), for appellants.

*Lawrence A Costich*, *Averil B. Rothrock*, and *Milt Reimers* (of *Schwabe Williamson & Wyatt PC*), for respondents.

¶1 DWYER, J. — Gary and Pamela Roats appeal from a summary judgment order dismissing their claim against the Blakely Island Maintenance Commission Inc. (Association), a homeowner's association of which the Roatses, as property owners within the San Juan Aviation Estates (Estates) on Blakely Island, are members. The Roatses challenge the trial court's determination that the Association has the authority, pursuant to its governing documents, to create a limited liability company and, through that company, to enter into a lease to operate a marina, fuel dispensers, and a general store on the island.

¶2 The Roatses additionally challenge the trial court's denial of an award of attorney fees based upon a separate

claim on which they prevailed in part. On cross appeal, the Association challenges the trial court's award of attorney fees to the Association, asserting that the trial court improperly limited the fee award. Finding no error in the trial court's orders, we affirm.

I

¶3 The Roatses own two lots within the San Juan Aviation Estates, a residential subdivision located on Blakely Island. The Association, which governs the Estates, was incorporated in 1961 for the purpose of providing services "for the occupants and owners of San Juan Aviation and Yachting Estates." In addition to the "Articles of Incorporation" (Articles) that created the Association as a nonprofit corporation in the state of Washington, the Association has throughout the years adopted various governing documents. These documents include the "By-Laws of the Blakely Island Commission, Inc." (By-Laws), adopted in 1971, and the "Blakely Island Covenants" (Covenants), adopted in 1995.[1]

¶4 The Association governs more than merely the residential subdivision. It also owns and maintains property separate from the residential lots owned by its members, including an airport landing strip, tennis courts, all nonprivate roads designated on the plat, a fire station, a water treatment system, the right to draw water from nearby Horseshoe Lake, two parks, a recycling center, and a beach access lot. Since May 2006, the Association—through the Blakely Community Facility Inc. (BCF), a limited liability company wholly owned by the Association—has also leased and operated the privately owned Blakely Island Marina. The marina consists of a dock, fuel dispensers for

---

[1] In these subsequently adopted governing documents, the residential subdivision governed by the Association is referred to as the "San Juan Aviation Estates." The Association appears to have adopted a shorthand version of the corporate name "San Juan Aviation and Yachting Estates" that was employed when the Articles were originally adopted in 1961.

cars and boats, and a general store. These are the only amenities of their kind on Blakely Island.

¶5 The Association first contemplated leasing and operating the marina in early 2005, when the marina's owner, Blakely Island Marina LLC, announced that it would cease operating certain marina facilities and offered to lease those facilities to the Association. The Association thereafter sought to gauge its members' interest in operating those portions of the marina; to that effect, it created a special committee and surveyed its membership. In November 2005, the Association held a special meeting to determine whether to lease the marina facilities and create a subsidiary to oversee related operations. At that meeting, a majority of the membership approved a motion to authorize the board of the Association (Board) "to undertake and conclude negotiations to lease certain portions of the [marina]."

¶6 The Association thereafter created the BCF, and the BCF entered into a lease with the owner of the marina. Pursuant to the lease, the BCF, as lessee, is entitled to operate the marina facilities "in support of the Blakely community," including the marina's "vehicle and boat fueling systems, barge ramp, water taxi landing dock, boat ramp, marina store, public restrooms, parking lot and BBQ shed." The lessor, Blakely Island Marina LLC, retains control of the moorage floats and entitlement to the rents and profits received by leasing out moorage slips at the marina. In addition to entering into the lease, the Association authorized various expenditures related to the BCF and operation of the marina facilities.[2]

---

[2] The Association maintains that each of these expenditures was properly approved by the membership. The Roatses, however, contend that proper notice and voting procedures were not followed in authorizing the related expenditures, apparently suggesting that the membership's approval of the expenditures was invalid. However, the Roatses do not assert on appeal that the Association lacks the authority to operate the marina facilities based upon such purportedly improper procedures; rather, the Roatses contend that the Association's governing

¶7 In early 2009, the Association mailed an annual assessment to its members. The assessment included the 2008 BCF- and marina-related expenses, estimated to be $1,123.70 per lot. The Roatses refused to pay the portion of their assessment related to marina expenses. The Association thereafter threatened to file a lien against the Roatses' property based upon the unpaid assessment.

¶8 In May 2009, the Roatses filed a first amended complaint, asserting five causes of action against the Association and its Board: (1) a declaratory relief claim regarding the validity of the Covenants, (2) a declaratory judgment action asserting that the Association did not have the authority to lease and operate the marina and levy related expenses, (3) an action to quiet title based upon the Association's notice threatening to assert a lien against their properties, (4) a breach of duty of care claim against the Association's board members, and (5) a claim asserting open meetings violations pursuant to RCW 64.38.035.[3]

¶9 The Roatses asserted in their complaint that "[o]n June 30, 2006, *Blakely Community Facility, LLC* entered into a *Lease Agreement* with *Blakely Island Marina, LLC*, leasing the marina, store and fuel operations." In their request for declaratory relief, they "maintain[ed] that the Bylaws for the [Association] do not permit the Board to create a separate entity to enter into a lease with Blakely Island Marina, LLC to operate a retail operation, including the refueling operations." They further "maintain[ed] that the Board was and is without authority to assess fees to fund the operation for the marina, store and fuel operations and the maintenance [thereof]." Thus, the Roatses asserted that they "are entitled to a declaration that [the Association] has no such authority."

---

documents do not give it the authority to operate the marina facilities and to levy against its members pro rata shares of related expenses.

[3] Although the Roatses initially filed their complaint as a class action lawsuit, the motion for class certification was thereafter dismissed on summary judgment without the plaintiffs' resistance to the dismissal.

¶10  The Roatses thereafter sought a temporary restraining order to enjoin the Association from filing liens against their property for nonpayment of the assessment. On May 14, 2009, the Roatses' motion for a temporary restraining order was vacated by stipulation of the parties and the Roatses deposited the estimated amount of their overdue assessment into the superior court registry. The stipulation stated that the Roatses would thereby be "considered current on their Annual Assessments."

¶11  All but one of the Roatses' claims against the Association and its Board were thereafter dismissed. First, the trial court entered an order granting the parties' stipulation to dismiss the Roatses' quiet title claim, which was premised upon the Association's threat to file a lien against the Roatses' properties. Then, the Association moved for partial summary judgment dismissal of the Roatses' claim for declaratory judgment regarding the validity of the Covenants. The trial court granted the Association's motion.[4] The Roatses thereafter moved to voluntarily dismiss their claim for breach of duty of care. The trial court granted the motion, thus dismissing that claim.

¶12  On May 7, 2010, the Association filed a motion for summary judgment, seeking dismissal of the Roatses' two remaining claims—that the Association did not have the authority to lease and operate the marina facilities and to levy related assessments and that the Board members had violated open meetings requirements set forth in chapter 64.38 RCW. The Roatses filed a motion for partial summary judgment on their claim regarding the scope of the Association's authority. Specifically, they sought a declaratory judgment that the Association "lacks authority to operate a marina, conduct fueling operations, and manage a general store; to assess property owners for expenditures and/or operating losses arising from such operations; and to file, or

---

[4] The Roatses challenged this order in their opening brief on appeal but withdrew that assignment of error in their reply brief. Thus, the validity of the Covenants is not in issue on appeal.

threaten to file, liens on the [Roatses'] properties for non-payment of those assessments." In their motion, the Roatses contended that the Association lacks the authority to engage in such activities because, they asserted, its governing documents do not confer upon it such authority.

¶13 The trial court held a hearing on the motions.

¶14 On July 15, 2010, the court entered an "Order on the Parties' Cross-Motions for Summary Judgment Relating to the Roatses' Second and Fifth Claims." The trial court granted the Association's motion for summary judgment dismissal of the Roatses' claim regarding the Association's scope of authority to operate marina facilities. However, the court denied the Association's request for dismissal of the Roatses' claim regarding open meetings violations. Instead, the trial court granted the Roatses' motion for partial summary judgment on that claim, which alleged a violation of RCW 64.38.035, "to the extent that the Court declare[d] that the Association failed to give proper notice to its membership for an undetermined number" of Board meetings. The trial court further declared that, contrary to the Roatses' assertion, "telephonic meetings by [Board members] do not constitute a violation of RCW 64.38.035."

¶15 The parties thereafter each filed additional motions for summary judgment regarding the Roatses' open meetings violations claim. The Roatses sought an order declaring that the Association and board members violated the open meetings statute by failing to provide "the requisite notice" for 28 specific board meetings. The Roatses additionally sought an award of attorney fees pursuant to RCW 64.38.050 based upon that claim. In its motion, the Association sought dismissal of the Roatses' open meetings violations claim and a ruling that no additional remedies were available to the Roatses based upon that claim. The Association sought an award of attorney fees pursuant to RCW 64.38.050 and provisions within the Association's By-Laws and Covenants.

¶16 Following an additional hearing, on October 13, 2010, the trial court ruled that the Association and board members had violated the open meetings statute with regard to 18 meetings, concluding that the other asserted violations were statutorily time barred. The court ordered that it would not grant further relief to the Roatses on their open meetings violations claim and denied the Roatses' request for an award of attorney fees based upon that claim. The court additionally denied the Association's motion for summary judgment. However, the court determined that the Association was the substantially prevailing party in the litigation and, thus, awarded to the Association fees and costs in an amount to be determined through later proceedings.

¶17 On November 12, 2010, in response to the Roatses' motion for reconsideration, the trial court clarified by letter ruling that its award of attorney fees to the Association was based upon a provision of the By-Laws allowing for such an award when fees are incurred in enforcing unpaid assessments. The trial court was "convinced that this lawsuit was fundamentally a dispute concerning assessments" and did not construe the By-Laws provision allowing a fee award "to apply only when [the Association] initiates a lawsuit to collect unpaid assessments." On November 29, 2010, the trial court set forth these rulings in an order.

¶18 The Association thereafter moved for an award of $206,446.49 in attorney fees and costs. The trial court granted to the Association an award of attorney fees and costs in the amount of $13,797.42. The court determined that the Association was entitled to an award of fees "incurred prior to the May 14, 2009 stipulation [regarding dismissal of the Roatses' motion for a temporary restraining order] and deposit of unpaid assessments." The court based its award "only on the provisions [of the By-Laws], concerning collection of assessments, and not on which party was the prevailing party on other issues." The court explained that "[o]nce the unpaid assessments were depos-

ited with the Court, the lawsuit was no longer about collecting unpaid assessments and was, instead, about the extent of [the Association's] authority under the governing documents and about the procedures followed [in connection with Board meetings]." Thus, the trial court determined that the May 14, 2009 stipulation and deposit was "the most appropriate point for determining how to apportion the fees incurred by [the Association] in connection with the collection of unpaid assessments."

¶19 On July 2, 2011, following the entry of final judgment in the trial court, the Association held its annual meeting. At the meeting, its members voted to approve numerous amendments to the Association's By-Laws and Articles regarding the scope of the Association's authority.

¶20 The Roatses appeal. The Association cross appeals.

II

¶21 The Roatses contend that the Association's governing documents do not confer upon it the authority to operate the marina, fuel docks, and retail store or to levy against its members assessments for costs related to such operations. Thus, they assert, the trial court erred by dismissing on summary judgment their claim regarding the Association's scope of authority. Because the governing documents, when properly construed as "correlated documents," confer upon the Association such authority, we disagree.[5]

¶22 Where, as here, the facts are undisputed and the only issues are questions of law, the standard of review is de novo. *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 273, 883 P.2d 1387 (1994).

¶23 The governing documents of a corporation are interpreted in accordance with accepted rules of contract

---

[5] The Association contends that the Roatses' claim challenging its authority to engage in marina operations is moot due to the members' adoption of amendments to the By-Laws and Articles at the July 2011 annual meeting. However, that action does not resolve all questions presented to us on review. Thus, the case is not moot.

interpretation. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 696, 974 P.2d 836 (1999) (covenants); *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 859, 567 P.2d 218 (1977) (bylaws); *Walden Inv. Grp. v. Pier 67, Inc.*, 29 Wn. App. 28, 30-31, 627 P.2d 129 (1981) (articles of incorporation). The purpose of contract interpretation is to determine the parties' intent. *Shafer*, 76 Wn. App. at 275 (citing *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990)). Washington courts apply the "context rule" of contract interpretation in ascertaining the parties' intent. *Shafer*, 76 Wn. App. at 275. This rule "allows a court, while viewing the contract as a whole, to consider extrinsic evidence, such as the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective interpretations." *Shafer*, 76 Wn. App. at 275. "The 'context rule' applies even when the disputed provision is unambiguous." *Shafer*, 76 Wn. App. at 275. In addition, articles of incorporation, by-laws, and covenants are "correlated documents" that are construed together. *Rodruck v. Sand Point Maint. Comm'n*, 48 Wn.2d 565, 577, 295 P.2d 714 (1956); *Lake Limerick Country Club v. Hunt Manufactured Homes, Inc.*, 120 Wn. App. 246, 249, 84 P.3d 295 (2004). Because the governing documents are correlated, the scope of a homeowners' association's authority is not determined based solely upon one such document; rather, such a determination requires analyzing the documents as a whole. *Shafer*, 76 Wn. App. at 275-76.

¶24 In *Shafer*, we applied these principles of contract interpretation in determining the authority of Sandy Hook Yacht Club Estates, a nonprofit corporation analogous to the Association herein, to adopt certain restrictions on its members' use of their private property. 76 Wn. App. at 275-77. There, the language of the plat dedication itself did not expressly grant to Sandy Hook the authority to adopt such restrictions. *Shafer*, 76 Wn. App. at 275. However, the articles of incorporation did. *Shafer*, 76 Wn. App. at 275. Because the plat dedication and articles of incorporation

were " 'correlated documents,' " we determined that the absence of an express grant of authority within the plat dedication was not dispositive. *Shafer*, 76 Wn. App. at 275 (quoting *Rodruck*, 48 Wn.2d at 577). Rather, because such a grant of authority was evidenced in the articles of incorporation, we concluded that Sandy Hook was authorized by its governing documents to adopt the particular restrictions at issue therein. *Shafer*, 76 Wn. App. at 275.

¶25 In so concluding, we also relied upon Sandy Hook's "subsequent conduct" in three times adopting new restrictions applicable to its members' privately owned property. *Shafer*, 76 Wn. App. at 276. We considered this previous conduct to be a "confirmation that the reservation of power was intended to apply to all plat property." *Shafer*, 76 Wn. App. at 276. Thus, we determined that "Sandy Hook's interpretation that the reservation of power was intended to apply to all property within the plat [was] clearly the more reasonable one." *Shafer*, 76 Wn. App. at 276.

¶26 Here, the Association's Articles, By-Laws, and Covenants govern whether the Association has the authority to engage in marina operations and to levy against its members assessments related thereto. The Articles, through which the Association was incorporated, were drafted in 1961 and not thereafter amended prior to the commencement of this litigation. Article III briefly sets forth the purposes of the Association:

> The purposes of this corporation, hereinafter referred to as association, is [sic] to provide water, road and landing strip maintenance for the occupants and owners of San Juan Aviation and Yachting Estates, and to promulgate and enforce rules and regulations necessary to insure equal and proper use of the same.

Moreover, the Articles provide that the Association "shall have all of the powers prescribed in R.C.W. 24.04.080, and, generally, to do all things necessary and proper to carry out

the purpose of its creation, as any individual might do, all in accordance with the laws of the State of Washington."[6]

¶27 The Association's By-Laws provide that the purpose of the By-Laws

> is to provide for the administration, maintenance, improvement, and protection of the properties, easements, access agreements, water rights, and equipment owned by the Association. Further, the Association may promulgate and enforce rules and regulations which are consistent with the [Covenants] and make further rules and regulations which the Association from time to time may deem necessary.

The By-Laws define the "property and equipment" that is "owned and maintained" by the Association:

> The property and equipment owned and maintained by the Association includes *but is not limited to* the Property Manager's residence, airport landing strip, taxi-way, tie-down area, buffer strip, tennis court, all roads (except private) as designated on the Plat; the Fire House and underlying land; all water lines and easements in connection therewith from Horseshoe Lake to the Plat; including all pumps, tanks, water treatment system, buildings housing the equipment, easements for water lines both inside and outside the Plat, water rights to draw water from Horseshoe Lake, Parks at Driftwood Beach & South Runway, recycle center, and the 40' Beach access lot.

(Emphasis added.) Moreover, the By-Laws explicitly grant to the Association the authority to levy assessments against its members "for maintenance and necessary capital improvements." The amount of the annual assessment is to be "based upon an estimate of the amount required to accomplish the purposes set forth in Article III of the Articles of Incorporation (and no more) . . . ."

¶28 The Covenants, adopted in 1995, are the most recently adopted governing document of the Association. The

---

[6] This provision demonstrates the dated nature of the Articles, as RCW 24.04.080 was repealed in 1967. The general powers of corporations are today set forth in RCW 24.03.035.

Covenants set forth extensively the powers and duties of the Association's Board. Pursuant to the Covenants, the following are among the Board's powers:

> To levy assessments for operating and maintenance expenses, and to collect such assessments upon owners of the properties contained in such plat in accordance with the [Covenants] and the [Association's] Bylaws and Articles of Incorporation. The San Juan Aviation Estates plat, or any assessed lot or tract thereof, shall be subject to any liens assessed by the [Association].

> To have the power, through the [Association], after approval of its members, to incur indebtedness on behalf of the [Association], to finance said improvements and to maintain the same. The plat of San Juan Aviation Estates and the property contained therein shall be subject to the control and management of the [Association] in the manner described in [these Covenants], and in accordance with the [Association's] Articles of Incorporation and Bylaws and the mandate and approval of its members.

> Through the [Association], after approval of its members, to acquire and own real or personal property, within, contiguous or adjacent to the plat of San Juan Aviation Estates, and to levy assessments against the owners of assessed lots or tracts for the payment of the acquisition price, taxes and costs of maintenance of the real or personal property; provided, however, that such property must be reasonably necessary for [the Association's] use and benefit.

> On behalf of the [Association], after approval of its members, to execute easements, licenses, conveyances and other legal documents to carry out the business interests of the [Association].

■ ¶29 The Roatses contend that none of the Association's governing documents authorize the marina operations, urging us to adhere to a strict construction of the governing documents—in particular, focusing on the absence of the word "marina" within those documents—rather than interpreting the documents collectively and taking into account the circumstances leading to their adoption

and the subsequent conduct of the parties.[7] However, such considerations are relevant to our determination of the Association's scope of authority pursuant to its governing documents. *See Shafer*, 76 Wn. App. at 275.

¶30 Here, the Covenants explicitly authorize the Board, through the Association, to engage in the types of activities challenged by the Roatses. The Roatses assert that the Association was not authorized to create the BCF and, through that subsidiary, to lease and operate the marina, fuel docks, and general store. They additionally challenge the Association's authority to levy assessments against its members for costs related thereto. But the broad grant of authority within the Covenants permits such activities. The Covenants provide that, with approval of the Association's members, the Board may "execute easements, licenses, conveyances and other legal documents to carry out [its] business interests." In addition, the Board is authorized—again, with the approval of its members—to incur indebtedness on behalf of the Association to finance and maintain improvements.[8]

¶31 Moreover, the Covenants allow the Board, after obtaining the approval of the Association's members, "to acquire and own real or personal property" and "to levy assessments against the owners of assessed lots" for costs related thereto, provided that the property acquired is "reasonably necessary for [the Association's] use and benefit." The "use and benefit" provided by the Association's

---

[7] In support of this contention, the Roatses cite *Shiflett v. John W. Kelly & Co.*, 16 Ga. App. 91, 93, 84 S.E. 606 (1915), in which the Georgia Court of Appeals held that a corporation incorporated as an insurance business could not operate as a "locker club," buying, selling, and distributing alcohol to its members. We find the factual distinctions between *Shiflett* and this case to be so great as to diminish the persuasive force of such noncontrolling authority.

[8] The Roatses contend that this provision of the Covenants, because it states that the Board may "incur indebtedness on behalf of the [Association], to finance *said improvements* and to maintain the same," (emphasis added), refers only to the "improvements" listed within the Board's powers and duties. However, both the By-Laws and the Covenants indicate that the Association has the power "to acquire and own real or personal property," thus indicating that the Association's authority is not constrained in the manner suggested by the Roatses.

operation of the marina facilities is clear—the San Juan Aviation Estates, located on Blakely Island, which is not serviced by Washington State Ferries, is accessible to the Association's members only by airplane or boat. Given the circumstance presented here—that the marina's owner planned to cease operating certain marina facilities—the members reasonably sought, as contemplated by the Covenants, to confer upon the Association the authority to engage in operation of the marina facilities in order to maintain their access to those significant amenities.[9]

¶32 As explained, the governing documents of the Association are "correlated documents" that must be interpreted collectively. *See, e.g., Rodruck*, 48 Wn.2d at 577. Thus, the authority granted to the Association by its Covenants is not vitiated because its Articles are less expansive. Indeed, it is unsurprising that the Articles do not make explicit mention of each of the current functions of the Association—not only the marina operations challenged herein, but also the administration of fire protection and garbage disposal facilities. The Articles were adopted in 1961 and not thereafter amended prior to the commencement of this litigation. Similarly, it is of no surprise that the By-Laws and Covenants do not explicitly mention marina operations; when those documents were drafted, the marina's owner provided the marina-related amenities. Moreover, although the Articles do not use the word "marina," they do indicate an expectation that access to the island by boat is an amenity associated with membership. Indeed, in its incorporating document, the corporate name given to the residential subdivision is the "San Juan Aviation and Yachting Estates," thus manifesting a presupposed access to the island by either airplane or boat.

---

[9] The circumstances presented here differ from those presented in most cases in which the authority of a homeowners' association is challenged. Generally, the challenged action is one that would change the amenities associated with membership. Here, the Association's actions were designed to maintain the existing state of affairs—the availability of the marina facilities to the Association's members.

¶33 Furthermore, the Covenants' broad grant of authority to the Association, the exercise of which requires in some instances the approval of its members, encompasses the marina operations challenged herein. As in *Shafer*, the subsequent conduct of the parties indicates that such operation is within the scope of the Association's authority. *See Shafer*, 76 Wn. App. at 276. The members voted not only to authorize the Association to engage in marina operations; they thereafter voted multiple times to approve related expenditures. Moreover, as explained above, the circumstances surrounding the adoption of the governing documents reveal the reason that explicit mention of the word "marina" is not made therein. *See Shafer*, 76 Wn. App. at 275 (noting that courts consider extrinsic evidence, including "the circumstances leading to the execution" of the governing documents, in interpreting such documents). Given these considerations, the Association's interpretation of its governing documents to permit marina operations, after obtaining the approval of its members, is "the more reasonable one." *Shafer*, 76 Wn. App. at 276.

¶34 Nevertheless, the Roatses contend that the majority of the Association's members cannot impose upon the minority financial obligations related to operation of the marina facilities. In support of this contention, the Roatses rely upon *Meresse v. Stelma*, 100 Wn. App. 857, 866, 999 P.2d 1267 (2000). There, five of the six property owners within a residential subdivision voted to amend its restrictive covenants in order to relocate an access road. *Meresse*, 100 Wn. App. at 858. A "road maintenance covenant" provided for maintenance, repairs, and additional constructions on the existing road. *Meresse*, 100 Wn. App. at 866. The covenants additionally provided that the vote of a majority of the property owners was required in order to " 'change or alter' " the covenants. *Meresse*, 100 Wn. App. at 865 (emphasis omitted).

¶35 The court held that the "road maintenance covenant" was insufficient to put an owner on notice "that he or

she might be burdened, without assent, by road relocation at the majority's whim." *Meresse*, 100 Wn. App. at 866-67. The court distinguished *Shafer*, noting that, there, the power whereby the new restriction was adopted was " 'exercised in *a reasonable manner consistent with the general plan of the development.*' " *Meresse*, 100 Wn. App. at 865 (quoting *Shafer*, 76 Wn. App. at 273-74). Such was not the case, the court determined, with regard to the relocation of the access road. *Meresse*, 100 Wn. App. at 865 n.9.

¶36 In contrast, we determined in *Shafer* that Sandy Hook was authorized to adopt new restrictive covenants binding all of the property owners without the agreement of all of the property owners. 76 Wn. App. at 273. There, unlike in *Meresse*, we concluded that the homeowners' association had "exercised [its power] in a reasonable manner consistent with the general plan of the development." *Shafer*, 76 Wn. App. at 273-74. In such a circumstance, we held, "an express reservation of power authorizing less than 100 percent of property owners within a subdivision to adopt new restrictions respecting the use of privately owned property is valid." *Shafer*, 76 Wn. App. at 273-74.

¶37 Here, the Roatses contend that the Association is not authorized by its governing documents to engage in marina operations—*not* that, as in *Meresse* and *Shafer*, the Association cannot *amend those documents* in order to obtain such authority. Moreover, here, the Association has exercised its authority, pursuant to its governing documents and with the approval of its members, "in a reasonable manner consistent with the general plan of the development" of the Estates. *Shafer*, 76 Wn. App. at 273-74; *cf. Meresse*, 100 Wn. App. at 865. The location and nature of the Estates necessarily affects the determination of what constitutes a reasonable exercise of authority "consistent with the general plan of the development." As previously mentioned, the Estates are located on Blakely Island, which is accessible only by boat or airplane and which is not serviced by Washington State Ferries. The Association owns and

operates an airport, presumably for this very reason. Thus, to the extent that *Meresse* is applicable, the operation of the marina is consistent with the general plan of development of the Estates and, thus, may be authorized by a majority of the Association's members. *See Shafer*, 76 Wn. App. at 273-74.

¶38 We note that, in the trial court, the Roatses sought broad declaratory relief with regard to the Association's scope of authority, requesting a declaratory judgment that the Association "lacks authority to operate a marina, conduct fueling operations, and manage a general store; to assess property owners for capital expenditures and/or operating losses arising from such operations; and to file, or threaten to file, liens on the [Roatses'] properties for nonpayment of those assessments." Accordingly, in denying their motion for summary judgment, the trial court denied this broad request for relief. It is the trial court's order denying such relief from which the Roatses now appeal. At oral argument on appeal, however, the Roatses shifted their focus to the specific lease pursuant to which the Association's subsidiary engages in the operation of marina facilities. They asserted that, because the marina's owner continues to provide moorage, the Association need not engage in operation of marina facilities in order for the Association's members to continue accessing Blakely Island by boat.

¶39 Although our review is limited to the order from which the Roatses appeal—which, in turn, is based upon their pleadings and requested relief—we note that the Roatses' shift in focus does not alter our resolution of this case. The fact that the marina's owner continues to lease out moorage slips at the marina does not answer the question of whether the Association has the authority, pursuant to its governing documents, to engage in the actions challenged by the Roatses here. Moreover, were the Roatses granted their requested relief, the Association would be precluded from entering into legal arrangements,

such as that challenged here, in order to maintain the amenities anticipated with membership. The Association neither owns the marina nor—based upon the record here—possesses access or easement rights for its use. Thus, a person of suitable wealth could acquire the marina and exclude the Association's members from its use. The governing documents, by conferring upon the Association the authority to enter into legal arrangements such as the lease challenged herein, provide the means by which the Association can maintain its members' access to such amenities.

¶40 In determining the scope of the Association's authority, we interpret its governing documents collectively as "correlated documents" and consider extrinsic evidence in determining the parties' intent as demonstrated by those documents. Here, these principles lead us to conclude that the Association, which is granted broad authority in its Covenants, is authorized, with the approval of its members, to engage in the operation of the marina facilities. Thus, the trial court did not err by determining that the Association's governing documents confer upon it such authority and, accordingly, dismissing on summary judgment the Roatses' scope of authority claim.

## III

¶41 The Roatses next contend that the trial court erroneously denied their request for an award of attorney fees incurred in litigating the open meetings violations claim. Because the trial court did not abuse its discretion by determining not to grant an award of fees, we disagree.

¶42 The Roatses based their request for an award of attorney fees in the trial court on RCW 64.38.050, which provides, "Any violation of the provisions of [chapter 64.38 RCW] entitles an aggrieved party to any remedy provided by law or in equity. The court, in an appropriate case, may award reasonable attorneys' fees to the prevailing party." "A trial court's decision to grant or deny attorney fees will not

be disturbed in the absence of an abuse of discretion." *Déjà Vu-Everett-Fed. Way, Inc. v. City of Federal Way*, 96 Wn. App. 255, 263, 979 P.2d 464 (1999). A trial court abuses its discretion if its decision is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *Tribble v. Allstate Prop. & Cas. Ins. Co.*, 134 Wn. App. 163, 170, 139 P.3d 373 (2006) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). "A trial court's decision is manifestly unreasonable if it is outside the range of acceptable choices." *Teter v. Deck*, 174 Wn.2d 207, 222, 274 P.3d 336 (2012).

¶43 Here, the trial court granted in part the Roatses' motion for summary judgment alleging that the Association had violated RCW 64.38.035, which sets forth the notice requirements for meetings of boards of directors of homeowners' associations. Although the Roatses had asserted 28 violations of that statute, the trial court granted summary judgment in favor of the Roatses with regard to only 18 of the 28 purported violations, determining that the other asserted violations were time barred. The trial court additionally ruled that it would provide no further relief to the Roatses—other than the court's declaration that 18 violations had occurred—based upon that claim. The court then denied their request for an award of attorney fees premised upon that claim.

¶44 RCW 64.38.050 grants the trial court discretion to award attorney fees "in an appropriate case." Here, the trial court determined that the Roatses had proved 18 of the 28 purported open meetings violations. However, it determined that an affirmative grant of relief was not warranted on these 18 claims. Under these circumstances, the trial court's denial of the Roatses' request for an award of attorney fees was within the range of acceptable choices available to the court. Thus, the trial court did not abuse its discretion by denying the Roatses' request.

## IV

¶45 The Roatses additionally assert that the trial court erred by granting an award of attorney fees to the Association. Conversely, the Association contends that the trial court erroneously limited the amount of fees that it awarded to the Association. The trial court did not abuse its discretion by granting an award of attorney fees to the Association. However, contrary to its contention, the Association is not entitled to an additional award of fees.

¶46 The trial court granted the Association's request for an award of attorney fees based upon Article VIII, Section 9 of the By-Laws, which provides that "[a]ll assessments shall be paid to the Association . . . and the amount of each assessment and the amount of any other delinquent assessments, *together with all expenses, attorney's fees and costs reasonably incurred in enforcing same* shall be paid by the member, and shall be a lien upon the lot or tract subject to said assessment . . . ." (Emphasis added.) The trial court awarded only those fees incurred "prior to the May 14, 2009 stipulation and deposit of unpaid assessments," reasoning that, "[o]nce the unpaid assessments were deposited with the Court, the lawsuit was no longer about collecting unpaid assessments and was, instead, about the extent of [the Association's] authority under the governing documents and about [board meeting] procedures." Thus, the trial court determined that "the May 14, 2009 deposit and stipulation [marked] the most appropriate point for determining how to apportion the fees incurred . . . in connection with the collection of unpaid assessments."

¶47 The Roatses contend that the trial court erred by granting an award of fees to the Association because, they assert, "[t]his litigation had nothing to do with 'enforcing' a 'delinquent assessment.' " The facts of this case belie that statement. Although the Association never asserted a claim against the Roatses in order to recover the unpaid assess-

ment, the Roatses filed this litigation, in part, in response to the Association's threat to file a lien against their property due to their failure to pay that assessment. The Roatses filed a motion for a temporary restraining order seeking to prevent the Association from filing a lien against their property; they also sought an order quieting title to their property due to the threat of a lien. Thus, the collection of the delinquent assessments was an issue in this litigation.

¶48 The Roatses also contend that the By-Laws authorize an award of attorney fees to the Association only if the Association brings an action to collect a delinquent assessment, which, here, it did not. They rely upon article IV, section 6 of the By-Laws, which provides that the Association "may bring an action at law" against a member who does not timely pay an assessment and that "there shall be added to the amount of such assessment all costs and expenses in connection with such suit, and also a reasonable sum as attorneys' fees." They assert that the two attorney fees provisions in the By-Laws—article VIII, section 9, relied upon by the trial court in granting the award of fees, and article IV, section 6—authorize an award of attorney fees to the Association only when the Association itself commences an action to collect a delinquent assessment. However, article VIII, section 9 of the By-Laws does not require that the Association commence litigation. As required by that provision, the Association was attempting to enforce the delinquent assessments—not by filing an action against the Roatses but, instead, by threatening to file a lien against their properties. Thus, the By-Laws authorized the trial court's grant of an award of attorney fees to the Association, and the court did not err by granting such an award.[10]

---

[10] The Roatses additionally assert that the Association may not be granted an award of attorney fees to the extent that those fees were paid by its insurer. In support of this contention, they cite to *Cascade Trailer Court v. Beeson*, 50 Wn. App. 678, 749 P.2d 761 (1988), in which the court held that a landlord's insurer had

¶49 In its cross appeal, the Association contends that the trial court erred as a matter of law by limiting the award of attorney fees to those authorized by the By-Laws. The Association contends that it was entitled to an additional award of attorney fees based upon the Covenants and RCW 64.38.050. The Association further asserts that the trial court should not have limited the award of fees to those incurred prior to the May 14, 2009 stipulation and deposit of the delinquent assessments into the court registry.

¶50 The provision of the Covenants relied upon by the Association authorizes the Board to enforce provisions of the Covenants and to issue penalties where the Covenants are violated. It provides that the Board may "[c]ommenc[e] litigation designed to secure compliance of the remedy [for violation of the Covenants]. In the event litigation is commenced, the owner who is in violation shall be obligated to pay all costs of such litigation, including the payment of reasonable attorneys' fees." Unlike the By-Laws provision pursuant to which the trial court granted an award of attorney fees to the Association, this provision explicitly contemplates that the Association must commence litigation. Because the Association did not do so here, the trial court did not err by declining to grant an award of fees pursuant to this provision.

¶51 The Association also contends that it is entitled to an award of attorney fees based upon RCW 64.38.050, which

no subrogation rights against certain tenants for fire damage to the premises caused by the tenants. The court there explained its holding:

> Where the landlord has secured fire insurance covering the leased premises, the tenant can reasonably expect the insurance to cover him as well, unless the parties have specifically agreed otherwise. Why?—because the tenant is in privity of contract with the landlord, and he has a property interest in the premises the insurance protects.

*Beeson*, 50 Wn. App. at 686. *Beeson* is inapposite and provides no support for the Roatses' contention that the Association may not be granted an award of attorney fees, notwithstanding the provision in the By-Laws authorizing such an award, simply because its insurer provided coverage for such litigation expenses. Importantly, the purpose of such an award is not simply to "make the Association whole," as the Roatses contend; it is also to discourage the nonpayment of assessments by the Association's members.

provides that "[t]he court, in an appropriate case, may award reasonable attorneys' fees to the prevailing party" in an action for violation of the homeowners' association act. As explained above, this statutory provision confers upon the trial court broad discretion in granting or denying an award of fees. Here, the only claim premised upon chapter 64.38 RCW, the homeowners' association act, is the Roatses' claim for open meetings violations. This is also the only claim upon which the Roatses, at least in part, prevailed. Thus, the trial court did not err by declining to grant an award of attorney fees to the Association based upon RCW 64.38.050.

¶52 Finally, the Association asserts that the trial court erred by limiting its award of attorney fees to those incurred prior to the May 14, 2009 stipulation and deposit of the delinquent assessments with the court. Pursuant to that stipulation, the Roatses agreed to vacate their motion for a temporary restraining order to prevent the Association from filing a lien against their property. In addition, they agreed to deposit the estimated amount of the delinquent assessments—$2,247.40—with the court. The stipulation provides that the Association "agree[s] that by depositing said funds with the court, [the Roatses] are considered current on their Annual Assessments for Lots No. 128 and No. 129 for the 2008-2009 fiscal year only and a lien will not be pursued for the 2008-2009 Annual Assessment."

¶53 The Association contends that the trial court erroneously limited its award of fees to those incurred prior to the May 14, 2009 stipulation because the Association did not actually recover the delinquent assessment until July 26, 2010. However, the By-Laws provision pursuant to which the trial court granted the award of fees provides that such fees are available only when incurred in enforcing a delinquent assessment. The record indicates that the trial court correctly determined that, once the delinquent assessments were deposited into the court registry, the litigation was no longer about enforcing the delinquent assessments.

Indeed, the stipulation itself provided that the Association agreed that the Roatses would thereby be considered current with regard to those assessments. Subsequent to the May 14 stipulation, the Association's scope of authority and the propriety of Board meeting procedures—not enforcement of the assessments—were the issues being litigated. The trial court granted the award of fees based upon the By-Laws provision that authorizes such an award only when those fees are incurred to recover a delinquent assessment. Thus, the trial court did not err by awarding only those fees incurred prior to the May 14 stipulation.

¶54 The trial court properly granted to the Association an award of fees based upon article VIII, section 9 of the By-Laws. Contrary to the Association's assertion, neither the Covenants nor RCW 64.38.050 authorizes an additional award of fees to the Association. Moreover, the trial court properly limited the award of fees to those incurred in enforcing the delinquent assessments prior to the May 14 stipulation.

V

¶55 The Association requests an award of attorney fees on appeal. The only basis for such an award in the trial court was the By-Laws provision upon which the trial court relied in granting the award. That provision allows for an award of fees incurred in the collection of unpaid assessments. Because the collection of the delinquent assessments is not in issue on appeal, we decline to grant an award of attorney fees to the Association.

¶56 Affirmed.

SPEARMAN, A.C.J., and ELLINGTON, J., concur.