IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GARRET SCHIREMAN, in his individual capacity, and as executor for THE ESTATE OF LOREN E. SCHIREMAN,<br><br>    Respondent,<br><br>     v.<br><br>CHRISTOPHER WILLIAMS,<br><br>    Appellant. | No. 83541-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Christopher Williams provided legal representation to Garret Schireman by responding to a TEDRA[1] petition filed by Alice Forrister, wife of Garret's late father Loren Schireman, in a dispute as to the character of real property.[2] The court awarded the house to the deceased's wife as community property based on its interpretation of a premarital agreement and Loren's will. Acting for himself and as personal representative for Loren's estate, Garret sued Williams for legal malpractice, alleging Williams failed to properly respond to the TEDRA petition with arguments supporting a claim to the house as separate property. The malpractice case proceeded to jury trial, where the jury found that

---

[1] Trust and Estate Dispute Resolution Act, chapter 11.96A RCW

[2] Garret and Loren share a last name. We refer to them by first name for clarity. Additionally, we use Alice's first name for simplicity, because the record references Alice Forrister, Alice Schireman, and Alice Forrister-Schireman. We intend no disrespect.

Williams had been negligent and proximately caused the Estate to lose its share of the house.

However, the character and disposition of the property is a question of law properly reserved to the trial court, rather than a jury. Based on the premarital agreement, we conclude as a matter of law that the house became community property upon Loren and Alice's marriage. More thorough work by attorney Williams could not have changed this outcome. Garret cannot demonstrate proximate cause to sustain the verdict. We reverse and remand for dismissal of his claim.

FACTS

I.    Premarital Agreement and Will

In December 1997, Loren Schireman executed a will "in contemplation of [his] upcoming marriage to Alice Forrister." The Will included a section entitled "bequest to future spouse" that read:

> This bequest is made with the contemplation of marriage to ALICE FORRISTER, I hereby give, devise and bequeath unto my future wife, ALICE FORRISTER, any community property of my estate, whether real or personal, and wheresoever situated provided she survives me by ninety (90) days.

This section concluded with an acknowledgement and ratification of an attached Premarital Agreement (PMA). The Will devised the remainder of Loren's Estate to his three children from his first marriage, including his son Garret Schireman.

Three days after Loren signed the Will, Loren and Alice both signed the PMA. The PMA stated "ALICE and LOREN plan to marry in the near future." The

2

document included two schedules of assets—one for Alice's separate property and one for Loren's separate property. Alice and Loren agreed to relinquish any right to the other's separate property. As to community property, Alice and Loren agreed to create a joint bank account for family necessities, living expenses, and the purchase of any agreed community property. Absent a future written agreement, the parties would contribute equally, and contributions would be considered community property. All funds from the joint account would go to the surviving spouse.

The PMA also addressed the construction of Alice and Loren's new residence. The pertinent section, Article V, established that, "[a]t the time of execution of this Agreement, the parties are actively involved in a joint venture relative to the purchase and construction of a residence [in] Arlington, Washington." The home was purchased in the names of "Loren Schireman, a single person, and Alice M. Forrister, a single person." The property purchase was financed through a promissory note executed by both Alice and Loren that was secured by a deed of trust against the lot. The loan for the construction of the home was signed only by Alice and secured by her separate property. The PMA set out expectations for the Arlington house:

> Both parties acknowledge they have actively participated in the decision to purchase the subject lot and pursue the construction of a residence thereon, and they desire that such lot acquisition and construction be considered a joint venture of the parties, wherein each party does in fact have a one-half (1/2) interest therein and a one-half (1/2) obligation associated therewith. To the extent one of the parties fails to make contributions consistent with his/her share of the underlying obligation, the party who is not delinquent may

make the contribution on behalf of the noncontributing party and thereafter it shall be considered to be a non-interest-bearing loan owed by the noncontributing party to the contributing party. In the event of the parties' marriage, this asset thereafter will be considered to be a community asset. To the extent that one party has contributed (or does contribute) disproportionately to the purchase and construction of the residence, the party who has made a greater contribution shall be entitled to a constructive lien against the community interest in such asset of the other party to the extent of the outstanding non-interest-bearing loan.

In the event of the death of one of the parties, the other party shall have the right to use, occupy and reside thereon for a period of up to one (1) year from the date of death of the other party. . . Furthermore, during the one (1) year period following the death, the surviving party shall have a right to purchase the deceased party's interest in the subject property by tendering to the heirs, successors, assigns or estate of the surviving party an amount equal to one-half (1/2) of the then fair market value of the property, subject to adjustment as necessary as it relates to any outstanding non-interest-bearing loan owed by one party to the other as the result of any disproportionate contribution.

Loren and Alice married soon after signing the PMA. More than a decade later, Loren signed a promissory note in favor of Alice for payment on the Arlington house. The promissory note specified:

Upon my demise, my estate shall pay to my wife, Alice M. Schireman, the amount of $35,000.00, which is the total she invested in the payoff of the loan for our residence at the above named address. This money shall be paid to Alice prior to the division of assets as listed in any existing will and/or codicil regarding the handling of my estate.

Loren died May 5, 2016, and his Estate went to probate with one of his daughters acting as personal representative until she was removed at her request. Garret then moved to be named personal representative of the Estate. He disputed the characterization of the Arlington house and its disposition to

4

Alice, arguing the house should have been included in the Estate and divided among the other beneficiaries.

II.     TEDRA Action and Attorney Williams's Representation

Alice filed a petition under the Trust and Estate Dispute Resolution Act (TEDRA) requesting transfer of the Arlington house to Alice and $35,000 from the Estate as agreed in the promissory note. The TEDRA petition argued that Loren and Alice entered into a PMA, "in which they agreed that they were constructing a residence [in] Arlington, Washington. The Prenuptial Agreement then states at Article V, 'In the event of the parties' marriage, this asset thereafter will be considered to be a community asset.' "

Garret hired attorney Christopher Williams to represent him in the ongoing dispute over the Estate. Williams[3] filed a two-page reply to the TEDRA petition objecting to the inclusion of the home as community property, noting the PMA states Alice has the right to purchase Loren's one-half interest in the property. The reply brief also stated that "Garret Schireman agrees to have the matter transferred to TEDRA."

The trial court determined the Arlington house was "community property as defined by the Premarital Agreement," and Loren's Will devised all community property to Alice. The court ordered transfer of the Arlington house to Alice, payment of $35,000 on the promissory note from the Estate to Alice, and

---

[3] In this section, "Williams" refers to Christopher Williams acting as legal representative for Garret and the Estate.

awarded $1,658.00 in attorney's fees and costs to Alice. The court's minute entry summarized its findings and includes the statement, "the intent of the testator is clear and unambiguous. The court sees no need for a trial and to burden the heirs when their claim is so tenuous."

Williams subsequently filed a motion for reconsideration, making the argument that the PMA establishes the parties' intention that the Arlington house was a joint venture with each party owning half interest as separate property. Williams also argued that awarding the house to Alice as community property conflicted with a survivorship provision of the PMA. Despite these statements, Williams conceded, "There is no dispute that the house is community property." Williams again requested the matter be "transferred to TEDRA" so the Estate could attempt to resolve the ambiguities of the Will. Williams also challenged the order for lack of notice to the Estate, as it had not yet appointed Garret as personal representative at the time of the hearing. The trial court denied the motion for reconsideration "with respect to the court's analysis and adjudication with regard to the" Arlington house. The court granted reconsideration on the issue of the $35,000 payment on the promissory note, concluding the obligation should be pursued as a claim against the Estate after proper notice to the personal representative.

Williams did not appeal the court's decisions and sent a letter to Garret confirming this decision. The Estate subsequently agreed to pay Alice the $35,000 for the promissory note.

6

III.     Trial Court Proceedings on Malpractice Claim

In July 2018, Garret filed a legal malpractice action against Williams on behalf of himself and Loren's Estate. Garret[4] alleged that Williams "did not take the TEDRA petition as seriously as was merited and consequently failed to abide by the standard of care. . . . Williams made no legal defense or attempt to rebut the petition's claims whatsoever."

Williams elected to have the issues tried by a jury. After extensive delay due to the COVID-19 pandemic, the parties finally proceeded to trial on the legal malpractice claim in November 2021. On the first day of trial, Williams filed a "motion in limine re CR 12(h)(2)" requesting dismissal for failing to state a claim. Williams argued his "decision-making squarely falls under [the] attorney judgment rule and reflects reasonable care irrespective of Plaintiff's absurd and novel theory of the case." He claimed Garret's theory was too speculative to support a legal malpractice claim. Williams also raised collateral estoppel, asserting that Garret sought to relitigate the failed TEDRA action. The trial court denied the motion, and the case proceeded to trial.

To establish the malpractice claim, Garret elicited testimony about Williams's duty of care, the quality of the representation, and interpretation of the PMA from attorney Duncan Connelly, a trust and estate attorney whose practice focuses on "working with clients to draft and interpret estate planning

---

[4] We refer to Garret and the Estate as Plaintiffs-Respondents in the malpractice action collectively as "Garret."

documents." Connelly described several rules of contract interpretation to the jury. He then used the rules to explain his interpretation of the PMA to the jury, raising several issues within the PMA that Williams failed to raise in support of Garret's position that the house was community property.

First, Connelly testified that the Arlington house is listed on Alice's schedule of separate property, but it is not mentioned in the community property and debt section of the PMA. The parties refer to the construction of their house as a "joint venture" in which they each have a one half interest and obligation. According to Connelly, the structure and language of this section of the PMA supports interpreting each's one half interest as separate property, because "[m]arital communities don't enter into joint ventures with themselves. . . . [Y]ou could have two spouses dealing with their own separate property going in on a joint venture . . . [but] it wouldn't make sense for it to be a community effort that way."

Connelly also discussed the survivorship provision in the PMA, which allowed the surviving party to live in the house for a year after the death of the other, and thereafter to purchase the deceased's half interest from the heirs. Connelly testified that the survivorship paragraph was consistent with the characterization of the house as separate property and would be irrelevant if the house was community property.

Additionally, the PMA established a loan provision if one party paid more money because the other could not contribute their full half. In the context of this

8

loan provision, Connelly testified about an interpretation that Williams now calls the "this asset" theory. The PMA provides:

> To the extent one of the parties fails to make contributions consistent with his/her share of the underlying obligation, the party who is not delinquent may make the contribution on behalf of the noncontributing party and thereafter it shall be considered to be a non-interest-bearing loan owed by the noncontributing party to the contributing party. In the event of the parties' marriage, <u>this asset thereafter will be considered to be a community asset.</u> To the extent that one party has contributed (or does contribute) disproportionately to the purchase and construction of the residence, the party who has made a greater contribution shall be entitled to a constructive lien against the community interest in such asset of the other party to the extent of the outstanding non-interest-bearing loan.[5]

According to Connelly, "this asset" did not refer to the Arlington house as stated in the TEDRA petition. Instead, "this asset is referring to that noninterest-bearing loan, the exact asset that was mentioned immediately preceding it in the sentence before it." The loan, rather than the house, became community property upon marriage. Connelly explained that this interpretation made sense under the last antecedent rule, and for the PMA as a whole.[6] He also opined that on a more-probable-than-not basis, the outcome of the TEDRA petition would have been different if Williams had met the standard of care.

After Garret presented his case-in-chief, Williams moved for a judgment as a matter of law under CR 50. He argued that Garret failed to prove a breach of

---

[5] (emphasis added).

[6] Connelly reasoned that if "this asset" referred to the house, Alice "ends up getting more than the full value of the house. She's getting the entirety of the house, and then she's also getting paid the promissory note on top of that." Connelly then opined that his interpretation "is a more reasonable, less arbitrary, and less absurd result."

the standard of care or proximate cause. According to Williams, his response to the TEDRA petition was short, but "frame[d] the issue, and dispute to the court." Additionally, Williams claimed there was no evidence on the record that anything he could have done would have resulted in a different outcome. The trial court denied the motion.

Williams's defense relied extensively on the testimony of expert Karen Bertram who "disagree[d] strongly" with Connelly's theory that "this asset" referred to the non-interest bearing loan. Bertram testified that based on her experience and the unambiguous nature of the documents, the provision meant "if the parties got married, the house would be considered a community asset." She explained that Connelly's theory "makes no sense," because "if there's a loan between two spouses, even if they're married . . . one spouse has the—the debt, which is their personal separate property liability, and the other spouse has essentially an account receivable which is an asset, which is their separate property. It can't be community property." Bertram opined on a more-probable-than-not basis, that the outcome of the case would not have been any different if Williams had raised the "this asset theory."

At the conclusion of the testimony, the jury returned a verdict for Garret. The jury found that Williams was negligent and his negligence was the proximate cause of the damage to Garret and the Estate. The jury awarded Garret and the Estate the stipulated damages of $211,658.

Williams appeals.

10

DISCUSSION

After Garret presented his case-in-chief, Williams brought a CR 50 motion for a judgment as a matter of law.[7] A court may grant a motion for judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue" and the claim "cannot under the controlling law be maintained without a favorable finding on that issue." CR 50(a)(1). Judgment as a matter of law is appropriate only when no competent and substantial evidence exists to support a verdict." Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 848, 348 P.3d 389 (2015). "A judgment as a matter of law requires the court to conclude, 'as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party.' " Id. at 848 (quoting Indus. Indem. Co. of Nw. v. Kallevig, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990)).

We review judgments as a matter of law de novo. Paetsch, 182 Wn.2d at 848. We construe all facts and reasonable inferences in favor of the nonmoving party. Id. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. Davis v. Microsoft Corp., 149 Wn.2d 521, 531, 70 P.3d 126 (2003).

---

[7] Along with his motions in limine, Williams brought a CR 12(h)(2) that functioned as a belated CR 12(b)(6) motion to dismiss for failure to state a claim. Williams filed the motion on November 1, 2021, to be heard the next day. The parties debated whether the motion was properly brought under CR 12(b)(6) instead of under CR 56 as a motion for summary judgment. We do not condone the filing of a dispositive motion, disguised as a motion in limine, one day before its hearing. Nevertheless, we may review the merits of Williams's claims as an appeal of the CR 50 motion.

To recover for legal malpractice, the plaintiff must establish:

(1) The existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between the attorney's breach of the duty and the damage incurred.

Hizey v. Carpenter, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992). Proximate causation consists of two elements—legal causation and cause in fact. Legal causation "rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend." Taggart v. State, 118 Wn.2d 195, 226, 822 P.2d 243 (1992). Cause in fact requires the plaintiff to establish the act at issue likely caused the injury. Nielson v. Eisenhower & Carlson, 100 Wn. App. 584, 591, 999 P.2d 42 (2000).

For legal malpractice, "proximate cause boils down to whether the client would have fared better but for the attorney's negligence." Lavigne v. Chase, Haskell, Hayes & Kalamon, P.S., 112 Wn. App. 677, 683, 50 P.3d 306 (2002). Determining cause in fact for legal negligence involving a litigation matter requires a "trial within a trial." Dang v. Floyd, Pflueger & Ringer, PS, No. 83002-3, slip op. at 18, (Wash. Ct. App. October 17, 2022) (published) https://www.courts.wa.gov/opinions/pdf/830023.pdf. "The trial court hearing the malpractice claim merely retries, or tries for the first time, the client's cause of action which the client asserts was lost or compromised by the attorney's negligence, and the trier of fact decides whether the client would have fared

better but for such mishandling." Daugert v. Pappas, 104 Wn.2d 254, 257, 704 P.2d 600 (1985).

In most cases, the question of cause in fact is for the jury. Id. However, "the unique characteristics of a legal malpractice action may, under some circumstances, make that general rule inapplicable." Brust v. Newton, 70 Wn. App. 286, 290, 852 P.2d 1092 (1993). Such circumstances include when a determination of proximate cause raises the need to engage in an analysis of law. Id. at 292; Daugert, 104 Wn.2d at 258. "[T]he line between questions for the judge and those for the jury in legal malpractice actions has generally been drawn between questions of law and questions of fact." Brust, 70 Wn. App. 290-91.

Garret's malpractice claim stems from the TEDRA court's determination that the Arlington house was community property bequeathed to Alice under the terms of the Will and the incorporated PMA, rather than ruling that the Estate had a half-interest in the house as Loren's separate property. The characterization of the Arlington house as either separate or community property is central to the malpractice claim. This determination requires interpretation of the Will and the PMA.

The characterization of property is a question of law. In re Marriage of Watanabe, 199 Wn.2d 342, 348-49, 506 P.3d 630 (2022). The interpretation of a will is also a question of law and reviewed de novo. In re Estate of Little, 9 Wn. App. 2d 262, 275, 444 P.3d 23 (2019). "The paramount duty of the court is to

give effect to the testator's intent when the will was executed." Id. The court must determine the intent from the language of the will as a whole. Id.

Prenuptial agreements are contracts subject to the principles of contract law. DewBerry v. George, 115 Wn. App. 351, 364, 62 P.3d 525 (2003). As with wills, the purpose of contract interpretation is to determine the parties' intent. Roats v. Blakely Is. Maint. Comm'n, Inc., 169 Wn. App. 263, 274, 279 P.3d 943 (2012). A question of fact arises when a contract has two or more reasonable interpretations. GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014). Interpretation of a contract provision is a question of law when the interpretation does not rely on the use of extrinsic evidence or only one reasonable inference can be drawn from the extrinsic evidence. Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 85, 60 P.3d 1245 (2003).

Here, neither party argues that the language in the PMA or the Will was ambiguous. Garret's expert testified that theirs was "the only interpretation that squares with Washington state law with regard to the rules relating to contract interpretation." Likewise, Williams's expert stated that "the testator's intent is clear and unambiguous and that the house was community property and should go to Alice Forrister Schireman." Thus, although the parties dispute the correct interpretation, they agree that the Will and the PMA are unambiguous.

We also agree that we can discern Loren's unambiguous intent from the Will and PMA. Interpretation of the contracts at issue does not require extrinsic evidence and determination of facts by a jury. Rather, the underlying issue in the

malpractice claim—the characterization of the property and its disposition under the Will and PMA—is a question of law properly reserved for the trial court.

Nevertheless, at the malpractice trial, the parties presented expert testimony as to their differing interpretations of the Will and the PMA. Then, the court submitted the question of the proper interpretation of the Will and PMA to the jury by providing the instruction, "if you find the defendant was negligent you must also decide what a reasonable judge would have done but for the Defendant's negligence." This instruction was error. Instead, the malpractice court should have considered the character of the property and the resulting determination of proximate cause as questions of law.

We now remedy the error. To interpret the contract, we give its words their ordinary, usual, and popular meaning unless the entirety of the agreement demonstrates a contrary intent. Hearst Commc'n, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). "An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective." Snohomish Cnty. Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc., 173 Wn.2d 829, 840, 271 P.3d 850 (2012).

The section of the PMA in which the disputed "this asset" sentence appears is entitled "Construction of Residence." The sentence is within a paragraph that begins by discussing the cost of "the overall project" and states the parties' desire for the lot acquisition and "construction of a residence thereon" to be a joint venture. The PMA then specifically states: "In the event of the

parties' marriage, this asset thereafter will be considered to be a community asset." "[T]his asset" therefore refers to the Arlington house.

Garret's interpretation, that "this asset" refers to the non-interest-bearing loan, is not reasonable, because at the time the parties signed the PMA, no such loan existed and potentially would never exist. "We impute an intention corresponding to the reasonable meaning of the words used." Hearst, 154 Wn.2d at 503.

Moreover, we must view the contract as a whole, interpreting the language in the context of other provisions of the contract. King County v. Vinci Const. Grands Projets, 191 Wn. App. 142, 177, 364 P.3d 784 (2015). The "this asset" sentence must be interpreted in light of the sentence that immediately follows. That sentence states, "To the extent that one party has contributed (or does contribute) disproportionately to the purchase and construction of *the residence*, the party who has made a greater contribution shall be entitled to a constructive lien against the *community interest in such asset* of the other party to the extent of the outstanding non-interest-bearing loan." (Emphasis added.) This sentence clearly contemplates that once married, the spouses would have a "community interest" in the residence. Had Loren not intended for the residence to become community property, this sentence would have been unnecessary. See In re Marriage of Marshall, 86 Wn. App. 878, 882-83, 940 P.2d 283 (1997) (quoting Farrow v. Ostrom, 16 Wn.2d 547, 555-56, 133 P.2d 974 (1943) (holding that equity will impress a lien on community property "in favor of one who is clearly

16

shown to have contributed separate funds to its acquisition or to the enhancement of its value thereafter.")).

Further, at the time the PMA was signed, Loren and Alice were not married, although the PMA stated that the parties "plan[ned] to marry in the near future." Therefore, at that point, each party's half interest in the joint venture was designated as separate property. Similarly, given that the parties were not yet married, the survivorship provisions were necessary to protect the parties' interests as they were at the time they entered into the PMA, i.e., before the marriage or in the event the marriage did not occur. Interpreting "this asset" to refer to the "joint venture," is reasonable in the context of the other provisions and the contract as a whole.

The only reasonable interpretation of the unambiguous language of the PMA is that the Arlington house is the asset that "thereafter will be considered to be a community asset." Therefore, we conclude as a matter of law that the Arlington house was community property.

Because the Arlington house was community property as a matter of law, Garret cannot demonstrate that the outcome of the TEDRA petition would have been different had Williams more thoroughly briefed and argued the case to the TEDRA court. Garret therefore fails to prove the proximate cause element necessary for legal malpractice. We reverse the judgment and remand for dismissal of Garret's malpractice claim.

17

_Chung, J._

WE CONCUR:

_Coburn, J._          _Andrus, C.J._