# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CASEY W. DOUGHERTY, | No. 47033-1-II |
| Appellant, | |
| v. | |
| HOLIDAY HILLS COMMUNITY CLUB, INC., | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, J. — Casey Dougherty appeals the trial court's summary judgment orders in his lawsuit against Holiday Hills Community Club, Inc. (HHCC) regarding HHCC's installation of a large water tank on Dougherty's property in 2011. The trial court ruled in a November 2014 order that HHCC had an express and/or prescriptive easement on Dougherty's property that allowed construction of the tank and ruled in a December 2014 order that HHCC was entitled to recover past due water assessments from Dougherty.

We hold that (1) HHCC did not have an express easement to install the 2011 water tank because the easement on which HHCC relies is restricted to the use and benefit of specific lots, and HHCC could not expand the easement's scope to include all HHCC members; (2) a genuine issue of material fact exists as to the existence of a prescriptive easement because of the adverse use element – whether Dougherty's predecessor gave HHCC permission to install a different water tank on lot 24 in 1981 – and the scope of any prescriptive easement; (3) we will not address HHCC's counterclaims for adverse possession or mutual recognition and acquiescence

because Dougherty did not assign error to the trial court's refusal to rule on them and HHCC does not ask us to affirm based on those claims; and (4) HHCC's water assessments against Dougherty were valid.

Accordingly, we reverse the trial court's November 2014 summary judgment order, affirm the trial court's December 2014 summary judgment order, and remand for further proceedings.

FACTS

HHCC owns and operates a private water system that serves the Holiday Hills subdivision and 11 lots in the adjacent Alderview Estates subdivision[1]. Dougherty owns lots 24 and 25 in Alderview Estates, which he purchased in 2011.

*Development of Subdivisions*

The property that constitutes the Holiday Hills subdivision was subdivided in 1964. Each lot's sales contract guaranteed that a water system would be installed for the benefit of the Holiday Hills lot owners. In 1967, Darl Moore purchased the original developers' remaining interest in Holiday Hills. Moore assumed the responsibility of installing, maintaining, and operating a water system at Holiday Hills.

HHCC was incorporated in 1968. According to the articles of incorporation, one of the purposes of HHCC was to:

> appropriate, purchase, divert, acquire and store water from [sources . . .], and to
> distribute the water so appropriated and acquired to its members for use upon the
> lands of said members and for domestic purposes; to acquire, own, construct,
> hold, possess, use and maintain such pumping plants, tanks, pipe lines, reservoirs,
> ditches, buildings, roads, trails, and appliances, and such other property.

Clerk's Papers (CP) at 170.

---

[1] Many of the documents refer to the subdivision as Alder View Estates. However, the parties refer to the subdivision as Alderview Estates. We use the parties' designation.

In 1976, Moore subdivided the property that constitutes the Alderview Estates subdivision. This subdivision adjoins Holiday Hills. Alderview Estates includes lots 24 and 25, which Dougherty now owns. Lots 24, 25, 26, and 27 are laid out in a circular pattern on the four sides of a hill known as "Nob Hill."

On the subdivision plat, Moore dedicated a number of easements to the use and enjoyment of the parties recited in each easement. One of the easements is what the parties refer to as the F-3 easement (although the subdivision plat calls it the "F-1 thru F-3" easement). This easement is entitled, "Access and Utility Easement" and states: "This is a grant of: [a] 20 foot easement restricted to the use and benefit of lots 24 thru 27, Alder View Estates." CP at 156. The F-3 easement continues "along the centerline of the existing road curving to the left over and across lots 27, 26, 25 and 24." CP at 156.

Andrew and Mildred Munden purchased Alderview Estates lot 25 in December 1976, and lot 24 in October 1979. Specifically with respect to lot 24, the Mundens purchased the property "[s]ubject to easements, reservations of record." CP at 265. The Mundens eventually became active in HHCC, and both served as officers.

*Water System History*

In 1967, Moore installed a 10,000 gallon water tank (1967 tank) to provide water to the HHCC lots. Dougherty refers to the 1967 tank as the "mid-level" tank.

In 1981, HHCC installed a 20,000 gallon water tank (1981 tank) on Alderview Estates lots 24 and 27. The tank primarily was located on lot 24, but a portion of the wooden shed covering the tank extended onto lot 27. The tank was almost entirely within the boundaries of the F-3 easement for access and utilities that the plat for Alderview Estates created. HHCC also installed water lines and pipe that were connected to the 1981 tank. The 1967 tank and 1981

tank worked together. The 1967 tank pumped water up to the 1981 tank through plastic piping, where it was distributed to the lots. At least by this time, the water system began providing water to 11 specified lots in Alderview Estates, including lots 24, 25, 26, and 27, as well as to the Holiday Hills lots.

In December 1981, Moore's estate conveyed its ownership interest in the water system to HHCC. The conveyance included the following:

> All right title and interest to all assets and liabilities, both real and personal, of that certain private community water supply system known as the "Holiday Hills Water System" including easements of records which serves the following described real property.

CP at 124. There is no evidence that Moore retained any interest in the F-3 easement or that he transferred any interest in the easement to HHCC.

In 2007, HHCC determined that the 1981 tank was failing. HHCC began planning to improve the water system, including finding a replacement for the 1981 tank. In 2008, HHCC obtained a $343,316 loan from the State of Washington to finance the new tank. In July 2010, HHCC submitted a master application for the "Holiday Hills Water System Improvements" to the Pierce County Planning and Land Services Department. HHCC applied for administrative design review, a SEPA permit, a site development permit, a variance, and a commercial building permit to build a replacement for the 1981 tank. Andrew Munden signed the master application on behalf of HHCC.

A public hearing was held on the application for the new water tank, and in November 2010 a hearing examiner approved the application. The hearing examiner found that "[t]he existing tank building [1981 tank] is located within the utility easement on both Lot 27 and Lot 24 of Alderwood Estates. Thus, the existing building crosses a property line but is located within the easement." CP at 137.

4

Work began on the new tank and improvements to the water system sometime between February and May of 2011. The new 54,000 gallon water tank (2011 tank), pump house, and related improvements were completed before the end of 2011. The water tank was located near the 1981 tank, and was entirely on lot 24 and entirely within the F-3 easement.

*Dougherty Purchase of Lots 24 and 25*

In January 2011, Dougherty contracted with the Mundens to purchase Alderview Estates lots 24 and 25. The Mundens' seller disclosure statement, which Dougherty signed on January 17, 2011, disclosed to Dougherty that the property's water source was private and there was an easement for access to and/or maintenance of the water source. Similarly, the seller disclosure statement informed Dougherty that he would be assessed $250 a year as a water fee for the "new storage tank." At the time that Dougherty purchased the property, he was told that a new tank would be installed on lot 24 and the old tank would be removed.

In February 2011, the Mundens transferred lots 24 and 25 to Dougherty by statutory warranty deed. The deed recognized that the property was burdened by a non-exclusive easement for ingress and egress. In addition, the deed provided that the conveyance was "subject to covenants, conditions, restrictions and easements, if any, affecting title, which may appear in the public record, including those shown on any recorded plat or survey." CP at 23.

After Dougherty purchased the lots, he began to correspond with HHCC in an attempt to negotiate a license or easement for the 2011 tank's placement on lot 24. HHCC refused to negotiate, instead asserting that the F-3 easement permitted the placement of the 2011 water tank on lot 24.

5

*Water Assessment*

Section 14 of the HHCC articles of incorporation states that the corporation could establish and collect assessments necessary to carry out the corporation's purposes, but not in excess of the maximum from time to time fixed by the bylaws. HHCC's bylaws never fixed a maximum for assessments.

After Dougherty purchased lots 24 and 25, he attempted to obtain a waiver for the water assessment on lot 24. The HHCC board declined to give Dougherty a waiver. Dougherty subsequently did not pay the water assessments on lot 24.

*Lawsuit*

In December 2013, Dougherty filed suit against HHCC. He alleged that HHCC did not have an easement that allowed placement of the 2011 water tank on his property. Instead, he alleged that the Mundens had granted HHCC permission to build the 1981 and 2011 tanks on their property. Dougherty requested a declaratory judgment regarding his and HHCC rights and obligations regarding lot 24 as well as other relief.

In HHCC's answer to the complaint, it admitted that the Mundens were aware of and participated in construction of the 1981 water tank, but denied that HHCC's use of lot 24 was permissive. HHCC counterclaimed to quiet title to the land under the 2011 water tank based on theories of adverse possession, mutual recognition and acquiescence, agreement express or implied by law, and/or estoppel. In the alternative, HHCC alleged that it was entitled to an irrevocable easement over and across the portions of lot 24 where the 2011 water tank and its related improvements were located as well as over the existing road for access to the tank. In addition, HHCC alleged that Dougherty had failed to pay water fee assessments he owed.

*November 2014 Summary Judgment Order*

In September 2014, Dougherty filed a motion for partial summary judgment. He argued, in part, that neither the F-3 easement nor a prescriptive easement theory allowed HHCC to install the 2011 water tank on lot 24. HHCC filed a cross motion for summary judgment, arguing in part that either the F-3 easement permitted installation of the 2011 water tank or that it had established a prescriptive easement that allowed installation of the tank.

In November 2014, the trial court denied Dougherty's motion for partial summary judgment, and granted HHCC's motion for partial summary judgment. The trial court ruled that HHCC had an express easement for the use of the 2011 tank and the improvements connected to it as well as an access easement to the tank across lot 24 for maintenance. In addition, the trial court ruled that HHCC had established a prescriptive easement to use the land under the 1981 tank because HHCC had held itself out as the owner of the tank. Finally, the trial court ruled that the original prescriptive easement could be expanded to apply to the 2011 tank even though it was not installed in the exact location of the 1981 tank. The trial court did not address the parties' remaining claims.

*December 2014 Summary Judgment Order*

In October 2014, HHCC filed a motion for summary judgment on its remaining claim that Dougherty had unpaid water assessments totaling over $2500.[2] Dougherty argued that he should not be obligated to pay his water assessments because the assessments were inconsistent with various terms of HHCC's corporate documents. In December 2014, the trial court granted

---

[2] In addition, HHCC requested that the trial court dismiss Dougherty's remaining claim for an injunction compelling HHCC to remove building materials and refuse from lot 24.

HHCC's summary judgment motion and entered judgment against Dougherty for $2,536, plus

prejudgment interest of $299, attorney fees of $200, and costs of $241.[3]

Dougherty appeals the trial court's two summary judgment orders.

ANALYSIS

A.      SUMMARY JUDGMENT STANDARD

We review a trial court's summary judgment order de novo.  *Rickman v. Premera Blue*

*Cross*, 184 Wn.2d 300, 311, 358 P.3d 1153 (2015).  We view all facts and reasonable inferences

drawn from those facts in the light most favorable to the nonmoving party.  *Id.*  If there are no

genuine issues of material fact and the moving party is entitled to judgment as a matter of law,

we will affirm the trial court's summary judgment order.  *Lakey v. Puget Sound Energy, Inc.*,

176 Wn.2d 909, 922, 296 P.3d 860 (2013).

The moving party bears the burden of first showing that there is no genuine issue of

material fact.  *Lee v. Metro Parks Tacoma*, 183 Wn. App. 961, 964, 335 P.3d 1014 (2014).  A

genuine issue of material fact exists where reasonable minds could differ on the facts controlling

the outcome of the litigation.  *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65,

324 P.3d 763 (2014).  If reasonable minds can reach only one conclusion on an issue of fact, that

issue may be determined on summary judgment.  *Id.* at 865.

B.      EXPRESS EASEMENT

The trial court ruled that HHCC had an express easement for the installation and use of

the 2011 tank as well as access to the tank across lot 24.  We disagree and hold that the trial court

erred in granting summary judgment in favor of HHCC on this basis because the F-3 easement

---

[3] Dougherty filed motions for reconsideration regarding both summary judgment orders.  The trial court denied both motions.

was restricted to the use and benefit of lots 24 through 27 and HHCC could not expand the easement's scope to include all HHCC members.

1. Legal Principles

The interpretation of an easement is a mixed question of law and fact. *Rainier View Ct. Homeowners Ass'n v. Zenker*, 157 Wn. App. 710, 719, 238 P.3d 1217 (2010). In determining the scope of an easement created by express grant, we look to the original grant language to determine the permitted uses. *Brown v. Voss*, 105 Wn.2d 366, 371, 715 P.2d 514 (1986). We construe the original parties' intent to an easement from the instrument as a whole. *Rainier View*, 157 Wn. App. at 720.

An easement is a right, distinct from ownership, to use the land of another. *Crisp v. VanLaecken*, 130 Wn. App. 320, 323, 122 P.3d 926 (2005). The easement is both a burden on the land as well as an interest in the land. *Id.* An "appurtenant" easement is one where the benefit of the easement is to another tract of land, referred to as the dominant estate. *Olson v. Trippel*, 77 Wn. App. 545, 554, 893 P.2d 634 (1995). The burdened property is referred to as the servient estate. *M.K.K.I., Inc. v. Krueger*, 135 Wn. App. 647, 655, 145 P.3d 411 (2006).

When the dominant estate is transferred to another owner, the appurtenant easement also transfers, unless limited by the creation or transfer of the easement. *810 Props. v. Jump,* 141 Wn. App. 688, 698, 170 P.3d 1209 (2007). When the servient estate is transferred, the appurtenant easement transfers only if the successor in interest had notice of the easement, either actual, constructive, or implied. *Id.* at 699.

2. Easements Affecting Lot 24

The Alderview Estates subdivision plat created lot 24 and the other Alderview Estates lots as well as a number of easements affecting those lots. The plat stated that Moore, the

subdivider, dedicated "the easements 'B, C, D, E., F, H and I' " described in the plat "to the use and enjoyment of those parties recited in each easement." CP at 153. Moore reserved easement G to himself, successors, and assigns. The plat stated that easements B, F, and G affected lot 24.[4]

The "F-1 thru F-3" easement is entitled "Access and Utility Easement," and describes the road to and the area at the top of Nob Hill where the 1981 and 2011 water tanks were installed. CP at 156. But that easement specifically states that the easement created is "restricted to the use and benefit of lots 24 thru 27." CP at 156. Moore, as the subdivider, did not reserve any interest in the F-3 easement to himself or to other lot owners in either the Holiday Hills or Alderview Estates subdivisions.

In contrast to the F-3 easement, a "B-1 thru B-3" easement is not restricted to the use and benefit of particular lots. Instead, it specifically grants the easement to the lot owners of both the Holiday Hills and the Alderview Estates subdivisions. Similarly, a "G-2" easement also is not restricted to the use and benefit of particular lots. Instead, it specifically reserves the easement without limitation to the "subdivider, successor and assigns;" i.e., Moore (the subdivider) and HHCC (his successor pursuant to the 1981 deed). CP at 156.

3. F-3 Easement Restricted to Lots 24 through 27

The 2011 water tank was installed within the boundaries of the F-3 easement. However, the plain language of the F-3 easement states that it is restricted to the use and benefit of Alderview Estates lots 24 through 27. This language unambiguously establishes that the F-3 easement allows access and utilities only for lots 24 through 27. The F-3 easement does not

---

[4] A fourth easement affecting lot 24, easement I, grants an easement to a light company for electrical service.

include language used in the B and G easements granting an easement to all lot owners or to the developer. As a result, the language of the F-3 easement did not authorize HHCC to install a water tank within the easement boundaries that benefitted all HHCC members.

HHCC argues that the easement's scope was permissibly expanded to the use and benefit of all HHCC members because that is how HHCC members and the Mundens interpreted the easement. Washington courts have recognized that "an easement can be expanded over time if the express terms of the easement manifest a clear intention by the original parties to modify the initial scope based on future demands." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 884, 73 P.3d 369 (2003). In such cases, the easement must clearly manifest this intent to "ensure[ ] subsequent purchasers have clear actual or constructive notice of the encumbrance based upon future demand." *Id.*

Here, the F-3 easement granted the right for an access and utility easement restricted to use and benefit of lots 24 through 27. This language does not manifest a clear intent to enlarge the express terms of the easement. Instead, the use of the term "restricted to" supports a narrow reading of the easement, limiting its use as a utility easement for lots 24 through 27. Further, the fact that the HHCC members and the owners of lots 24 through 27 may have interpreted the easement broadly is irrelevant because expansion is allowed only if intended by the *original* parties. Here, there is no evidence that *Moore* intended to expand the use and benefit of the F-3 easement to any lots other than lots 24 through 27.

HHCC also relies on *Moe v. Cagle*, 62 Wn.2d 935, 385 P.2d 56 (1963). In that case, the easement stated that it was granted in consideration of a set of covenants in the body of the easement. *Id.* at 937. The Supreme Court stated that "the grant is subordinate and obedient to the terms of the covenants. On the one hand, the grant may be restricted thereby, but, on the

other hand, it may, by the same token, be broadened." *Id.* In construing the easement, the court disagreed with the contention "that a strict construction of the expression of the parties must be given." *Id.* Instead, the surrounding circumstances could be considered in determining the parties' intentions. *Id.*

*Moe* is not applicable here. *Moe* does not hold, as HHCC argues, that an easement can be expanded to encompass its current use. Although the court in *Moe* did disagree that the easement must be strictly construed, this does not mean that we can construe an easement in a manner contrary to the express, unambiguous language of the easement.

Finally, HHCC points out that the 2011 water tank does benefit lots 24 through 27. Accordingly, HHCC's placement of the 1981 and 2011 tanks and lines on lot 24, was at least *partially* permitted by the F-3 easement. But the easement does not support HHCC's use of the easement for the benefit of other lot owners in HHCC.

We hold as a matter of law that the F-3 easement unambiguously provides access and utilities only for the use and benefit of Alderview Estates lots 24 through 27, and therefore that the F-3 easement did not authorize HHCC to install the 2011 water tank for the benefit of all HHCC lots. Accordingly, we hold that the trial court erred in granting HHCC's summary judgment motion and in denying Dougherty's summary judgment motion on this basis.

C.  PRESCRIPTIVE EASEMENT

Dougherty argues that the trial court erred in granting summary judgment in favor of HHCC and denying summary judgment in his favor on the existence of a prescriptive easement for installation of the 2011 water tank because (1) HHCC installed both the 1981 and 2011 tanks with the Mundens' permission, and therefore cannot satisfy the adverse use element of a prescriptive easement; and (2) HHCC cannot satisfy the 10-year use requirement of a

prescriptive easement for the 2011 tank, and any prescriptive easement for the location of the 1981 tank cannot be expanded to cover the location of the 2011 tank. We hold that there are genuine issues of material fact regarding the adverse use element of a prescriptive easement and the scope of any prescriptive easement.

1.   Legal Principles

Prescriptive rights are not favored in the law. *Gamboa v. Clark*, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015). To establish a prescriptive easement, the person claiming an easement must use another person's land for 10 years and show that (1) he or she used the land in an open and notorious manner, (2) the use was continuous and uninterrupted, (3) the use occurred over a uniform route, (4) the use was adverse to the landowner, and (5) the use occurred with the knowledge of such owner at a time when he was able in law to assert and enforce his rights. *Id.* The person claiming a prescriptive easement bears the burden of proving each element. *Id.*

Whether a claimant had satisfied the elements of a prescriptive easement generally is a mixed question of fact and law. *Id.* at 44. The existence of essential facts is a question of fact that we review for substantial evidence, but whether the facts as found establish a prescriptive easement is a question of law that we review de novo. *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997).

2.   Adverse Use Requirement

a.   Landowner's Permission

Dougherty challenges only the adverse use requirement. Adverse use generally means that the land was used without the landowner's permission. *Gamboa*, 183 Wn.2d at 44. A person's use is not adverse when the use is permissive in its inception – when the landowner actually gives that person permission to use the land. *Id.* at 45. And when a use of land is

13

permissive at its inception, that use " 'cannot ripen into a prescriptive right, no matter how long it may continue.' " *Id.* (quoting *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 84, 123 P.2d 771 (1942)). However, the fact that no permission was expressly asked and no permission was expressly given does not preclude a use from being permissive. *Cuillier v. Coffin*, 57 Wn.2d 624, 626, 358 P.2d 958 (1961).

In certain situations, courts presume that when a person enters onto another's land, that entry is done with the landowner's permission. *Gamboa*, 183 Wn.2d at 44. The presumption of permissive use applies in three factual scenarios: (1) when the land entered is unenclosed land, (2) when it is reasonable to infer that the use of enclosed or developed land was permitted by neighborly sufferance or acquiescence, or (3) when the landowner created or maintained a road and the neighbor used the road in a noninterfering manner. *Id.* The person claiming a prescriptive easement may defeat the presumption of permissive use " 'when the facts and circumstances are such as to show that the [use] was adverse and hostile to the rights of the owner, or that the owner has indicated by some act his admission that the claimant has a right of easement.' " *Id.* at 44-45 (quoting *Nw. Cities*, 13 Wn.2d at 87. To show that land use is adverse and hostile to the rights of the owner, the claimant must present evidence that "he or she interfered with the owner's use of the land in some manner." *Gamboa*, 183 Wn.2d at 52.

On the other hand, earlier cases hold that use of another's property for the 10-year prescriptive period without formal permission creates a presumption that the use was adverse. *See Cuillier*, 57 Wn.2d at 626-27 (citing list of cases). However, the court in *Cuillier* clarified that a more accurate statement is that the claimant's unchallenged use of another's property for the 10-year prescriptive period allows an inference of adverse use that may be considered along with other circumstances. *Id.* at 627. The court in *Gamboa* acknowledged this clarification, but

14

chose not to resolve whether unchallenged use created a presumption of adverse use or merely an inference. 183 Wn.2d at 46, 50.

b. Evidence of Permissive Use

Dougherty argues that the trial court erred in granting summary judgment in favor of HHCC based on a prescriptive easement because he presented evidence creating a genuine issue of material fact that the Mundens gave HHCC permission to install the 1981 water tank. We agree.

Neither party presented direct evidence from either the Mundens or HHCC members regarding whether the Mundens did or did not give HHCC permission to install the 1981 water tank.[5] Therefore, we must examine the circumstantial evidence and the reasonable inferences from that evidence.

Dougherty relies on three pieces of evidence. First, handwritten notes prepared by long-time HHCC member Robert White, state that "[a]uthorization for the placement of this tank [1981 tank] in its present location was orally given by the owners of lot 24. There is no legal easement in place." CP at 129. However, the trial court excluded this evidence as hearsay. We generally review de novo evidentiary rulings related to summary judgment. *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). But because Dougherty did not assign error to the trial court's evidentiary ruling, we do not consider this evidence. RAP 10.3(a)(4).[6]

_____

[5] The Mundens are now deceased.

[6] Under certain circumstances, we will consider an issue not asserted in an assignment of error if the appellant's brief clearly raises the issue. *See, e.g.*, *Sudar v. Fish & Wildlife Comm'n*, 187 Wn. App. 22, 30 n.5, 347 P.3d 1090 (2015). Here, however, Dougherty's brief simply notes in a footnote that the trial court excluded the evidence without expressly challenging that ruling. It

Second, in his complaint Dougherty alleged that the Mundens granted permission to HHCC to install the 1981 water tank and that they helped construct that tank. In its answer, HHCC responded to these allegations as follows: "[HHCC] admits that the Mundens were aware of and participated in construction of the improvements referred to therein . . . but denies that [HHCC's] use of the land in question is 'permissive.' " CP at 114. HHCC's admission that the Mundens were aware of and participated in the construction of the 1981 tank gives rise to a reasonable inference that the Mundens gave permission to HHCC to install the tank and therefore that HHCC's installation of the tank was not an adverse use. This inference creates a genuine issue of material fact on the adverse use requirement and precludes summary judgment in favor of HHCC on the existence of a prescriptive easement.

Third, the Pierce County Hearing Examiner's report stated that HHCC's vice president David Jenkins testified that lot 24 was "the only place that they have permission to place the [2011] tank, as one is present there now."[7] CP at 136. This statement creates a reasonable inference that the Mundens gave permission for HHCC to install the 2011 tank. This statement also creates an inference that the Mundens gave permission for HHCC to install the 1981 tank. It is unlikely that the Mundens would have given permission in 2011 if the existence of the 1981 had been adverse for the previous 30 years.[8]

---

was not until his reply brief that Dougherty argues that the trial court improperly excluded the evidence. We will not consider Dougherty's reply brief challenge to this evidence.

[7] HHCC argues that Jenkins' statement is hearsay and cannot be considered by this court. However, HHCC did not object to this evidence below and the trial court considered it determining whether HHCC's use was permissive. Accordingly, we hold that HHCC waived its objection.

[8] Dougherty also argues that the trial court erred to the extent that it granted a prescriptive easement based on the Hearing Examiner's decision that the tank was placed within an easement and was properly permitted. However, the trial court was not relying on the Hearing Examiner's

Dougherty also relies on the presumption of permissive use.  As stated above, one of the scenarios in which the presumption of permissive use applies is when the land entered is unenclosed land.  *Gamboa*, 183 Wn.2d at 44.  Here, lot 24 was heavily forested, except in the southwest portion, and does not appear to have been enclosed by a fence.  Because the lot was unenclosed, the presumption of permissive use applies unless HHCC can show that its use interfered with the Mundens' use of their property.[9]  *Gamboa*, 183 Wn.2d at 52.  Application of the presumption creates a genuine issue of material fact on the adverse use requirement and precludes summary judgment in favor of HHCC on the existence of a prescriptive easement.

We hold that viewing all facts and reasonable inferences drawn from those facts in the light most favorable to Dougherty, there is a genuine issue of material fact whether the Mundens gave HHCC permission to install both the 1981 and 2011 water tanks and therefore whether HHCC's installation of the tanks was adverse to the Mundens.  Accordingly, we hold that the trial court erred in granting summary judgment in favor of HHCC on the existence of a prescriptive easement.

c.    Evidence of Adverse Use

Holding that HHCC is not entitled to summary judgment regarding the existence of a prescriptive easement does not end our analysis because Dougherty also filed a summary

---

findings as evidence either for or against an easement.  Instead, the trial court referenced these findings to show that Dougherty had notice that the 2011 tank would be constructed.

[9] Whether installation of the 1981 water tank interfered with the Mundens' use of their property is a question of fact.  On one hand, if the Mundens did not use lot 24 at all, arguably there is no use for the tank to interfere with.  On the other hand, this case is different than many of the prescriptive easement cases where the claimant and the owner share a road or a path.  Use of a road does not necessarily interfere with another person's use of the same road.  But installation of a 20,000 gallon water tank would prevent the Mundens from using the area where the tank is located.

judgment motion. With regard to Dougherty's motion, we must view all facts and reasonable inferences drawn from those facts in the light most favorable to *HHCC*. We hold that there is a genuine issue of material fact as to whether HHCC's installation of the 1981 and 2011 water tanks occurred without the Mundens' permission.

Here, as noted above, there was no direct evidence that the Mundens did or did not give HHCC permission to install the 1981 water tank. However, HHCC acted as if it had the right to install and operate the 1981 tank for 30 years. HHCC members made improvements to the water system, and HHCC paid to maintain the system. Lot owners in Holiday Hills and Alderview Estates continuously used the water system. Throughout this entire time, HHCC members accessed the water tank via a road that crossed the Mundens' property. This use clearly was adverse to the Mundens' ownership of lot 24. As a result, this evidence creates an inference that HHCC's use of a portion of lot 24 was an adverse use. *See Cuillier*, 57 Wn.2d at 627.

In *Northwest Cities*, the Supreme Court held that a prescriptive easement claimant's direct predecessor's acts of laying out a road, regularly improving and maintaining the road, and regular use of the road were sufficient to indicate a hostile intent to the owner's rights and use of the property. 13 Wn.2d at 90-91. The court noted that the claimant "made the same use of appellant's land, to the extent noted, as it would have made if the land had been its own." *Id.* at 91. Because the facts here are somewhat similar to those in *Northwest Cities*, that case supports a finding of a genuine issue of material fact on whether HHCC's installation of the 1981 water tank was adverse.

We hold that viewing all facts and reasonable inferences drawn from those facts in the light most favorable to HHCC, there is a genuine issue of material fact as to whether the Mundens gave HHCC permission to install both the 1981 and 2011 water tanks and therefore

18

whether HHCC's installation of the tanks was adverse to the Mundens. Accordingly, we hold that the trial court properly denied summary judgment in favor of Dougherty based on the adverse use requirement for a prescriptive easement.

    3.   Scope of Prescriptive Easement

Even if genuine issues of material fact exist regarding whether HHCC's installation of the 1981 and 2011 water tanks was adverse, the 2011 tank clearly has not been in place for 10 years as required for a prescriptive easement. Therefore, HHCC can claim a prescriptive easement over the property where the 2011 tank is located only if the scope of any 1981 tank prescriptive easement extends to the location of the 2011 tank.

To determine the scope of a prescriptive easement, Washington courts generally look to the nature of the use during the prescriptive period. *Nw. Cities*, 13 Wn.2d at 92-93 (width of easement determined by the width of usage); *Mahon v. Haas,* 2 Wn. App. 560, 563, 468 P.2d 713 (1970).

Here, the evidence shows that HHCC used more than the footprint of the 1981 water tank. There were HHCC work parties, where members would traverse Nob Hill clearing brush and making repairs to the 1981 tank and lines (as well as performing road maintenance). In addition, HHCC member Cecil Hughes worked on the 1981 tank and lines, as well as the area around them, for multiple years. The record is unclear whether in the course of operating and maintaining the 1981 tank HHCC used the area where the 2011 tank was installed. But viewed in the light most favorable to HHCC, this evidence creates an inference that any prescriptive easement created in conjunction with the 1981 tank extended to the area where the 2011 tank was installed.

HHCC also seems to argue that in conjunction with the 1981 water tank it obtained a prescriptive easement in the entire F-3 easement. Again, the record is unclear regarding the full scope of the easement, but HHCC's extensive use of the property within the boundaries of the F-3 easement creates an inference that any prescriptive easement created in conjunction with the 1981 tank extended to the entire F-3 easement.

We hold that viewing all facts and reasonable inferences drawn from those facts in the light most favorable to HHCC, there is a genuine issue of material fact regarding the scope of any prescriptive easement regarding the 1981 water tank. Accordingly, we hold that the trial court properly denied summary judgment in favor of Dougherty on this basis.

D.     ADVERSE POSSESSION/MUTUAL RECOGNITION AND ACQUIESCENCE

HHCC asserted as a counterclaim that it was entitled to a decree quieting title to the land on which the 2011 water tank was installed under the doctrines of adverse possession and mutual recognition and acquiescence.[10] Because the trial court granted summary judgment in favor of HHCC, it ruled that these claims were moot and did not address them. Dougherty argues that the trial court should have addressed and granted summary judgment in his favor on these claims, and awarded him attorney fees under RCW 7.28.083(3) as the prevailing party in an adverse possession claim.

However, Dougherty did not assign error to the trial court's refusal to consider HHCC's adverse possession and mutual recognition and acquiescence claims and HHCC does not ask us to affirm based on those claims. Therefore, we decline to consider these claims. RAP 10.3(4).

---

[10] HHCC also asserted theories of agreement express or implied by law and estoppel. However, neither party addresses these claims on appeal.

E.      HHCC'S WATER ASSESSMENTS

Dougherty argues that his water assessments relating to the installation of the 2011 water tank were not lawfully imposed because (1) HHCC's bylaws did not authorize HHCC to obtain a loan to install the 2011 water tank; (2) HHCC's bylaws did not fix a maximum assessment as required in HHCC's articles of incorporation, and therefore all assessments are invalid until a maximum assessment is adopted by vote of two-thirds of HHCC members; and (3) HHCC did not provide the required notice to its members before adopting assessments for installation of the 2011 water tank.  We disagree.

1.    Legal Principles

A corporation's governing documents are interpreted in accordance with accepted rules of contract interpretation.  *Roats v. Blakely Island Maint. Comm'n, Inc.*, 169 Wn. App. 263, 273-74, 279 P.3d (2012).  Contractual language generally must be given its ordinary, usual and popular meaning.  *Jensen v. Lake Jane Estates,* 165 Wn. App. 100, 105, 267 P.3d 435 (2011).  Contract interpretation is a question of law that we review de novo.  *Dave Johnson Ins. v. Wright,* 167 Wn. App. 758, 769, 275 P.3d 339 (2012).

The purpose of contract interpretation is to determine the parties' intent.  *Roats,* 169 Wn. App. at 274.  To assist in determining intent, this court may apply the "context rule" adopted in *Berg v. Hudesman,* 115 Wn.2d 657, 666-69, 801 P.2d 222 (1990).  The context rule applies even when the provision at issue is unambiguous.  *Roats,* 169 Wn. App. at 274.  This rule " 'allows a court, while viewing the contract as a whole, to consider extrinsic evidence, such as the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective interpretations.' "  *Id.* (quoting *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.,* 76 Wn. App. 267, 275, 883 P.2d 1387 (1994)).

When interpreting a corporation's governing documents, we may consider all of such documents, including deeds, articles of incorporation, and bylaws. *Roats,* 169 Wn. App. at 274. These are considered " 'correlated documents' " and must be construed together as a whole. *Id.* (quoting *Rodruck v. Sand Point Maint. Comm'n,* 48 Wn.2d 565, 577, 295 P.2d 714 (1956)).

If after analyzing the language and considering extrinsic evidence (if appropriate), a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations, the provision is ambiguous and we construe that ambiguity against the document's drafter. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014).

2.  Loan for 2011 Water Tank

Dougherty argues that the vote of a majority of voting members present was insufficient under HHCC's bylaws to authorize HHCC's $350,000 loan from Washington State for the 2011 water tank. We disagree.

HHCC's bylaws permit the treasurer to establish a "Water Maintenance Fund," which is for "the maintenance and operation of the [HHCC] Water System." CP at 179-80. Dougherty seems to argue, without much discussion and without citation to any authority, that these provisions do not authorize a large capital expenditure like the purchase of a water tank.

The question here is whether HHCC's replacement of the 1981 water tank with the 2011 water tank constituted "maintenance and operation" of the water system. A reasonable interpretation is that "maintenance" encompasses the replacement of failing water system components. The fact that the replacement of failing components involves a large capital expenditure does not make a difference. The bylaws do not contain any special rules for capital expenditures or for large expenditures.

We hold that "the maintenance and operation" of the water system included HHCC obtaining a loan to purchase and install the 2011 water tank.

3. No Fixed Maximum Amount

Section 14 of the articles of incorporation provides that the corporation's purpose is to:

> fix, establish, levy and collect annually such charges and/or assessments as may be necessary, in the judgment of the board of trustees to carry out any or all of the purposes for which this corporation is formed, *but not in excess of the maximum from time to time fixed by the By-Laws*.

CP at 170 (emphasis added). Dougherty argues that this italicized portion of section 14 requires that HHCC's bylaws set a maximum amount that can be assessed. We disagree.

Dougherty's interpretation of section 14 is inconsistent with its plain language. Section 14 does not state that the bylaws must fix a maximum assessment or that a maximum must be adopted before any charges may be assessed. Instead, it states that assessments cannot be in excess of a maximum fixed by the bylaws "from time to time." CP at 170. This language indicates that at times there will be a maximum and at times there will not be a maximum. If a maximum has been fixed, an assessment cannot exceed that amount. But if no maximum has been fixed, nothing in section 14 states that all assessments are invalid.

This interpretation is consistent with the context rule, which allows this court to consider the subsequent conduct of the parties after the articles of incorporation were executed. *Roats*, 169 Wn. App. at 274-75. When HHCC was formed, a maximum water assessment fee was not adopted, and no subsequent board of trustees has done so in the following 45 years. This suggests that the drafters of HHCC's articles of incorporation did not intend to require that the bylaws set a maximum assessment amount.

We hold that HHCC's water fee assessments were not unlawful even though HHCC's bylaws do not fix a maximum assessment.

23

    4.    Meeting Notice Requirements

Dougherty argues that HHCC did not meet certain statutory notice requirements , and therefore that any actions taken without the proper notice requirements – presumably including approving the loan for the 2011 water tank – were invalid.  We hold that even if HHCC failed to provide proper notice to Dougherty after 2011, that failure was not material to the adoption of water assessments in 2007.

Dougherty stated in his summary judgment declaration that he had issues with receiving HHCC meeting notices.  His declaration stated that HHCC "repeatedly failed to provide [him] notice of various meetings, of anticipated votes, mail [him] ballots, or give [him the] ability to comment as a community member, prior to votes taking place, since I bought AE 24 and 25."  CP at 897-98.  However, Dougherty purchased lots 24 and 25 in 2011, several years after HHCC had met and voted to approve installation of the 2011 tank and the annual water assessments.  Dougherty did not present evidence that HHCC failed to satisfy the notice requirements for *those* meetings.  Therefore, Dougherty failed to establish that any procedural deficiency would have invalidated those approved actions or impacted his water assessments in any way.

Dougherty failed to create any genuine issues of material fact regarding the validity of his water fee assessments.  Accordingly, we hold that the trial court did not err in granting summary judgment in favor of HHCC on this issue.

No. 47033-1-II

## CONCLUSION

We reverse the trial court's November 2014 summary judgment order, affirm the trial court's December 2014 summary judgment order, and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
JOHANSON, C.J.

25